IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ROBERT MCDANIELS,

    Plaintiff,                No. CIV S-03-0154 MCE JFM P

    vs.

HIGH DESERT STATE PRISON MEDICAL STAFF, et al.,

                             <u>ORDER AND</u>

    Defendants.           <u>FINDINGS & RECOMMENDATIONS</u>

/

        Plaintiff is a state prisoner proceeding pro se with a civil rights action pursuant to 42 U.S.C. § 1983. Plaintiff claims that defendants violated his rights under the Eighth Amendment by acting with deliberate indifference to his serious medical need for treatment of an eye injury.

        In his November 10, 2004 filing, plaintiff renews his request for appointment of counsel. Plaintiff's prior requests for appointment of counsel were denied by this court's orders of May 19, 2004 and April 19, 2005. For the reasons stated in those orders, plaintiff's November 10, 2004 request for appointment of counsel will also be denied.

        This matter is before the court on defendants' motion for summary judgment.

/////

SUMMARY JUDGMENT STANDARDS UNDER RULE 56

Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See id. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11. The opposing party

1 must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome
2 of the suit under the governing law, see <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248
3 (1986); <u>T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n</u>, 809 F.2d 626, 630 (9th Cir.
4 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could
5 return a verdict for the nonmoving party, see <u>Wool v. Tandem Computers, Inc.</u>, 818 F.2d 1433,
6 1436 (9th Cir. 1987).

       In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." <u>T.W. Elec. Serv.</u>, 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" <u>Matsushita</u>, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

       In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. <u>See</u> <u>Anderson</u>, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. <u>See</u> <u>Matsushita</u>, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. <u>See</u> <u>Richards v. Nielsen Freight Lines</u>, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), <u>aff'd</u>, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" <u>Matsushita</u>, 475 U.S. at 587 (citation omitted).

26 /////

1   On December 5, 2003, the court advised plaintiff of the requirements for opposing
2 a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure. See Rand v. Rowland, 154
3 F.3d 952, 957 (9th Cir. 1998) (en banc), cert. denied, 527 U.S. 1035 (1999), and Klingele v.
4 Eikenberry, 849 F.2d 409 (9th Cir. 1988).

ANALYSIS

I. Undisputed Facts

At all times material hereto, defendant J. Rohlfing was a physician and surgeon, defendant C. Barton was a Medical Technical Assistant (MTA), defendant I. Tate was an MTA, and defendant J. Rivas was a Correctional Lieutenant, all employed at High Desert State Prison.

On December 10, 2001, Yard Observation Officer Soriano, who was monitoring the Facility-C yard, saw plaintiff and inmate Johnson striking each other with their fists in the head and upper torso areas. (Defts.' Separate Statement of Undisputed Facts ("SUF"), Ex. A-3.) Officer Soriano used the public address system and ordered the inmates to get down. (Defts.' SUF, Ex. A-3.) To prevent the inmates from further injuring each other, Officer Soriano shot a "skat round" upwind of the inmates. (Id.) The shots landed about five feet away from the area where plaintiff and Johnson were fighting, but their fighting continued. (Id.) Officer Soriano then shot a second "skat round" toward the inmates which landed about five feet away. (Id.) Plaintiff and Johnson continued fighting. (Id.)

After the second shot was fired, inmate Clark ran toward the fight and began to strike inmate Johnson in the face. (Id.)

Prison staff responded to the incident and formed a skirmish line around the inmates and gave several orders for them to get down. (Id.) Inmate Johnson backed away from plaintiff and inmate Clark, and took a defensive stance, but none of the inmates complied with the prison staff's orders to get down. (Id.)

/////

/////

Control Booth Officer Gorbet fired one "skat round" aiming about nine feet in front of the inmates. (Id.) The rounds landed on the basketball court about thirty feet from the inmates. (Id.)

In an attempt to get the inmates down on the ground, Control Booth Officer Lau then discharged three "skat rounds" toward the inmates. (Id.) The first round landed about fifty yards short of the three inmates and had no effect. (Id.) The second round was also too far from the inmates to have an effect. (Id.) The third round landed near the basketball court. (Id.) CN gas drifted near the inmates, but the inmates refused to get down. (Id.)

Officer Soriano again ordered the inmates to get down, but they refused. (Id.) Officer Soriano fired another "skat round" in their direction, which landed about five feet in front of the inmates. (Id.) The gas appeared to take effect, as all three inmates got down on the ground. (Id.)

The three inmates were escorted to holding cells in the program area. (Id.) All inmates were offered a chance to be decontaminated from the effects of the CN gas, but all declined. (Id.)

At approximately 10:10 a.m., plaintiff and inmate Johnson were examined by MTA Tate. (Id.) Plaintiff had a nosebleed and swelling and bruising to his left eye. (Id.) Plaintiff's nose was cleaned with Betadine, and he was given ice for his eye. (Id.) Plaintiff was then cleared for placement in administrative segregation. (Id.; Ex. A-4.)

A use of force video was conducted by Lt. Shelton in the Facility C Program Office. Sgt. Cagel operated the videocamera. (Id., Ex. C; Pl.'s November 10, 2004 Decl. at 3.) Plaintiff stated he had been hit in the eye with a block during the altercation. (Defts.' SUF, Ex. C.) Plaintiff agreed that his injuries were a swollen and bruised left eye and a nosebleed. (Id.) Plaintiff stated he had received medical attention, but had not been given any pain medication.

/////

/////

1   (Id.) In the videotaped interview, plaintiff did not request to be seen by a doctor or state that he

2   was in pain.[1] (Id.) Defendant Lt. Rivas did not take part in the use of force interview.[2] (Id.)

3           Plaintiff was then placed in administrative segregation.   (Id., Ex. 4.)

4           On December 17, 2001, plaintiff filed an inmate grievance stating he had not seen

5   a doctor for the eye injury he sustained on December 10, 2001, and complained of having a bad

6   headache and blurry vision. (Id., Ex. A-5.) Plaintiff further stated he had requested pain pills for

7   his pain. (Id.) Plaintiff asked to see a doctor to have his head checked for any major head injury

8   or eye injury. (Id.) MTA Barton responded at the informal level and told plaintiff to fill out a

9   health care request form to be seen by a doctor. (Id.)

10          An MTA's license does not allow the MTA to diagnose or treat an inmate's

11  medical condition or prescribe medications for an inmate. (Barton Decl., Deft.'s SUF, Ex. D.)

12  The MTA forwards sick call requests to the clinic, where a registered nurse determines how to

13  prioritize treatment for inmates and schedules appointments. (Id.) The MTA does not schedule

14  medical appointments. (Id.) The MTA does not establish medical policies or procedures for the

15  prison. (Id.)

16          On December 19, 2001, plaintiff appealed to the first formal level and requested

17  emergency services. (Deft.'s SUF, Ex. A-5.)

18          On December 20, 2001, plaintiff appeared before the Institutional Classification

19  Committee for his initial administrative segregation review. (Defts.' SUF, Ex. A-6.) Plaintiff

---

[1] Plaintiff contends that "[o]nce an inmate has to make a Video For 'Excessive Force Use' the seriousness of the inmate medical needs should have been noted and sent immediately to Medical Physician." (Pl.'s November 10, 2004, Motion at 3.) In his declaration, plaintiff concedes that he is aware of the procedures required to see a doctor, and states he filled out several sick call slips in an effort to see the doctor, the first of which he alleges was submitted on the day of the incident, December 10, 2001. (Pl.'s November 10, 2004 Decl. at 2-3.)

[2] In his complaint, plaintiff contends defendant Rivas ran the videocamera during the Use of Excessive Force videotaped interview and alleges defendant Rivas ignored plaintiff's requests to see a doctor, which plaintiff concedes were not on the videotaped portion of the interview. In his opposition, plaintiff concedes the camera was operated by Sgt. Cagel. Plaintiff included no evidence or charging allegations as to defendant Rivas in his opposing papers.

1    told the committee he was in good health.  (Id.)  The report does not reflect that plaintiff asked to
2    see a doctor or complained of being in pain.  (Id.)  Plaintiff refused to be placed on a walk-alone
3    yard and asked to go to the Controlled Compatible exercise yard.  (Id.)

4           On December 22, 2001, plaintiff was released for exercise where he stayed for
5    about three and a half hours.  (Defts.' SUF, Ex. A-4.)  Plaintiff continued long daily exercise
6    sessions during his placement in administrative segregation.  (Id.)

7           On December 22, 2001, plaintiff was interviewed by Correctional Officer Ginder,
8    who was assigned as the initial investigator on the charges of mutual combat.  (Defts.' SUF, Ex.
9    A-7.)  Plaintiff had no comment about the fight, but stated that after being medically evaluated
10   the day of the incident, he had not been able to see the MTA.  (Id.)  There was no notation that
11   plaintiff stated he was in pain, or that he requested to see a doctor.  (Id.)

12          Dr. Rohlfing examined plaintiff on January 15, 2001.  (Defts.' SUF, Ex. B, at 39.)
13   Plaintiff told Dr. Rohlfing plaintiff had been hit in the left eye and temple area with a block from
14   a "block gun" on December 10, 2001.  (Id.)  Plaintiff complained of having "some headache and
15   blurred vision on the left, . . . [but] the blurry vision kind of comes and goes."  (Id.)  Plaintiff
16   stated the headaches were periodic and he didn't know when they were going to come on.  (Id.)

17          Dr. Rohlfing found plaintiff's vital signs to be normal.  (Id.)  Upon examination,
18   Dr. Rohlfing stated there was no evidence of fractured nose, no abnormalities noted with the
19   areas of plaintiff's frontal bones, and no scars were noted.  (Id.)  Dr. Rohlfing noted plaintiff's
20   range of motion of his eyes was full, and that no other abnormalities were evident.  (Id.)  Dr.
21   Rohlfing's prognosis stated:

22   > It is likely the [headaches] will continue to improve.  There is
     > certainly no evidence of any significant injury in this particular
23   > area, and it likely will resolve on its own in time.  The area that
     > was hit is one of the hardest that we have, and typically long term
24   > [headaches] don't occur.

25   (Id.)  Dr. Rohlfing prescribed Tylenol for pain and referred plaintiff to optometry for a consult.
26   (Id.)

1        On February 2, 2002, Dr. Rohlfing examined plaintiff again. (Defts.' SUF, at 40.)
2 Plaintiff complained that his headaches and vision had worsened. (Id.) Dr. Rohlfing reported no
3 significant change in plaintiff's condition, but he referred plaintiff to optometry on an urgent
4 basis. (Id.) Dr. Rohlfing noted no further treatment beyond occasional pain medication seemed
5 necessary, but that would depend on the optometrist's findings. (Id.)

6        On February 8, 2002, Dr. Baron responded to plaintiff's administrative appeal.
7 (Defts.' SUF, Ex. A-5.) Dr. Baron noted that plaintiff was seen by Dr. Rohlfing on January 15,
8 and February 5, 2001. (Id.) Dr. Baron confirmed that there were no objective findings consistent
9 with a head injury other than plaintiff's complaints of intermittent headaches and blurred vision.
10 (Id.)

11        On February 21, 2001, plaintiff submitted his grievance to the second level of
12 review. (Id.) Plaintiff complained he had not yet been seen by an optometrist and requested an
13 MRI of his head. (Id.)

14        On March 2, 2002, plaintiff consulted with an optometrist. (Defts.' SUF, Ex. B at
15 79.) The optometrist found plaintiff had a high astigmatism and needed glasses. (Id.) This
16 diagnosis was consistent with two earlier diagnoses rendered on February 1, 2000 and October 1,
17 2001. (Defts.' SUF, Ex. B at 77-78.)

18        Plaintiff transferred to Pelican Bay State Prison on April 10, 2002, and at his
19 initial health examination, plaintiff stated he had no current medical problems. (Defts.' SUF, Ex.
20 A-2; Ex. B, at 85-87.) On April 17, 2002, plaintiff had his initial physical at which he
21 complained of blurry vision and dizziness. (Defts.' SUF, Ex. B, at 89.) Plaintiff was referred for
22 another optometry consultation on April 17, 2002. (Defts.' SUF, Ex. B, at 10.)

23        Optometrist Dr. Svennungsen saw plaintiff on May 20, 2002. (Defts.' SUF, Ex. B
24 at 81.) However, plaintiff did not complain of headaches or blurry vision, but requested different
25 frames for his glasses. (Id.)
26 /////

Prior medical records reflect that plaintiff complained of headaches and blurry vision prior to the December 10, 2001 incident herein. (Defts.' SUF, Ex. B, at 31-38.) After April 2002, plaintiff had no further complaints of blurry vision documented in his medical records. (Defts.' SUF, Ex. B.) After April 2002, plaintiff twice complained of headaches, the latter of which was related to allergies. (Defts.' SUF, Ex. B, at 45, 51.)

II. Plaintiff's Claims

Plaintiff claims that while he was housed at High Desert State Prison on December 10, 2001, he was injured when a block from a "skat round" ricocheted off the wall and hit him in the face. Plaintiff contends defendants were deliberately indifferent to his serious medical needs in violation of his Eighth Amendment rights because they delayed or denied him access to proper medical care. Defendants Tate, Barton and Rohfling seek summary judgment on the grounds that there is no evidence they were deliberately indifferent to plaintiff's medical needs. Defendants further contend they are entitled to qualified immunity. Defendant Rivas seeks summary judgment on the ground he was not personally involved in the deprivation of plaintiff's constitutional rights.

To prevail on his Eighth Amendment claims based on deliberate indifference to his medical need for treatment of an eye injury, plaintiff must show that defendants acted with deliberate indifference to serious medical needs. See Farmer v. Brennan, 511 at 825. Mere negligence is insufficient for Eighth Amendment liability. Frost v. Agnos, 152 F.3d 1124, 1128 (9th Cir. 1998). Deliberate indifference may be shown "when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." Hutchinson v. U.S., 838 F.2d 390, 394 (9th Cir. 1988). "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment." Hallett v. Morgan, 296 F.3d 732, 744 (9th Cir. 2002) (internal citations and quotation marks omitted). Where the claim is based on a delay in treatment, "a prisoner can make 'no claim for deliberate medical indifference unless

9

the denial was harmful.'"  McGuckin [v. Smith, 974 F.2d 1050] at 1060 [(9th Cir.1992), overruled on other grounds, WMX Techs., Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir.1997) (en banc)]  (quoting Shapley v. Nevada Board of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985)(per curiam)).  The harm caused by the delay need not, however, be "substantial." McGuckin at 1060 (citing Wood v. Housewright, 900 F.2d 1332, 1339-40 (9th Cir. 1990); also citing Hudson v. McMillian, 503 U.S. 1, 112 S.Ct. 995, 998-1000 (1992)).  In addition, mere differences of opinion between a prisoner and prison medical staff as to appropriate medical care do not give rise to a § 1983 claim.  Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981).

Plaintiff's claims against defendants MTAs Tate and Barton arise out of their alleged refusal to obtain medical treatment for plaintiff and/or their refusal to give plaintiff pain medication.  However, it is undisputed that the MTAs are not responsible for scheduling medical treatment and are not permitted to prescribe pain medication.  In addition, plaintiff was eventually provided medical care, where it was determined there was "no evidence of any significant injury in this particular area."  (Defts.' SUF, Ex. B, at 39.)

Plaintiff's claims against defendant Rohlfing are also unavailing.  Dr. Rohlfing examined plaintiff and determined no further medical treatment was required, other than a referral to optometry, which was expedited the second time Dr. Rohlfing saw plaintiff.  The medical records demonstrate that defendants were not deliberately indifferent to plaintiff's serious medical needs.  Based on plaintiff's injuries, this court cannot find that the delay plaintiff experienced rose to the level of a constitutional violation.

Moreover, the fact that plaintiff requested an MRI, which he was not given, does not demonstrate deliberate indifference.  Dr. Rohlfing found no evidence of significant injury. Plaintiff's belief that he sustained a serious head injury which required an MRI demonstrates a difference of opinion between plaintiff and the medical professionals who cared for him.  The medical records demonstrate that no other doctor ordered an MRI, which supports Dr. Rohlfing's conclusion that an MRI was not medically indicated.  This aspect of plaintiff's claim is premised

on a difference of opinion with his medical provider and is insufficient to prove a violation of the Eighth Amendment.  See Franklin v. Oregon, supra.

As noted above, plaintiff can prevail on his Eighth Amendment claim against defendants only if he can prove that defendants acted with deliberate indifference to a serious medical need.  Under the circumstances of this case, plaintiff cannot make the necessary showing.  At the time plaintiff was initially injured, he was treated for his nosebleed and given ice for his eye injury.  When plaintiff was treated by Dr. Rohfing there was no evidence of significant injury.  Dr. Rohfing stated that the headaches would diminish with time, which medical records demonstrate they did.  There is no evidence that plaintiff suffered any cognizable harm as a result of the delay he experienced in not seeing the doctor immediately after the injury was sustained.  On several occasions after the December 10, 2001 incident, plaintiff reported he was in good health and exercised frequently, and the records submitted do not support a theory that plaintiff was in constant or extensive pain while he waited to see the doctor.

For all of the foregoing reasons, this court finds that there is no triable issue of material fact as to whether defendants Tate, Barton or Rohfling acted with deliberate indifference to plaintiff's serious medical needs on December 10, 2001 or thereafter, and this court further finds that defendants Tate, Barton and Rohfling are entitled to summary judgment on plaintiff's Eighth Amendment claim.

As to defendant Rivas, plaintiff alleges in his complaint that defendant Rivas violated plaintiff's rights under the Eighth Amendment by denying him medical attention while defendant Rivas was allegedly videotaping the Use of Excessive Force videotape.  Plaintiff has provided no evidence of deliberate indifference by defendant Rivas other than plaintiff's initial statements in his complaint; indeed, plaintiff raised no allegations concerning defendant Rivas in plaintiff's opposing papers filed in response to defendants' motion for summary judgment.

/////

/////

The Civil Rights Act under which this action was filed provides as follows:

> Every person who, under color of [state law] . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. The statute requires that there be an actual connection or link between the actions of the defendants and the deprivation alleged to have been suffered by plaintiff. See Monell v. Department of Social Servs., 436 U.S. 658 (1978); Rizzo v. Goode, 423 U.S. 362 (1976). "A person 'subjects' another to the deprivation of a constitutional right, within the meaning of § 1983, if he does an affirmative act, participates in another's affirmative acts or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made." Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

It is undisputed that Office. Sgt. Cagel operated the videocamera. (Defts.' SUF, Ex. C; Pl.'s November 10, 2004 Decl. at 3.) It is also undisputed that plaintiff did not request to see a doctor during the videotaped portion of the interview. It is undisputed that plaintiff was aware of the procedures required to obtain a medical appointment. Thus there is no triable issue remaining as to defendant Rivas' involvement in this incident. Plaintiff has not established the personal involvement of defendant Rivas in any alleged constitutional violation. As noted above, plaintiff was provided medical treatment and, although his efforts to be seen by a doctor were delayed, he sustained no cognizable injury therefrom. Thus, defendant Rivas is also entitled to summary judgment.

For all of the foregoing reasons, defendants are entitled to summary judgment on plaintiff's Eighth Amendment claims against them.

In accordance with the above, IT IS HEREBY ORDERED that plaintiff's November 10, 2004 request for appointment of counsel is denied; and

IT IS HEREBY RECOMMENDED that:

1. Defendants' September 7, 2004 motion for summary judgment be granted; and

2. This action be dismissed.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within ten days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: July 29, 2005.

_____
UNITED STATES MAGISTRATE JUDGE

001; mcda0154.msj